MILWAUKEE COUNTY vs. PAUL and others.

*January 8 — January 29, 1884.*

COUNTY INSANE ASYLUMS: CONSTITUTIONAL LAW. *(1) Appropriations for improvements how made and expended. (2) Legislative control of county asylums.*

1.. Under sec. 8, ch. 233, Laws of 1881, the amounts to be appropriated for the improvement of the grounds and buildings of a county insane asylum are to be determined by the county board in its discretion; but moneys so appropriated are to be disbursed by the trustees of the asylum, and they may exercise their discretion as to the nature and character of the improvements. Said section does not, in this respect, enlarge the powers possessed by the trustees under ch. 298, Laws of 1878.

[2. How far the legislature may go in changing the control and management of county insane asylums, in abolishing the boards of trustees and conferring their powers upon other bodies, is not determined.]

APPEAL from the County Court of *Milwaukee* County.

The complaint,— after setting forth the purchase of a site and the erection of buildings for a county insane asylum by the board of supervisors of the plaintiff county, in pursuance of the law contained in secs. 604a–604m, R. S. (ch. 298, Laws of 1878), the organization of a board of trustees in pursuance of said law, and the expenditure by the county of large sums of money for such site and buildings, in improving and furnishing the same, and for the current expenses of

the asylum,— alleges that by virtue of the provisions of said law and of the said acts of its board of supervisors the plaintiff county became and now is the owner of said property, subject only to the conditions of said law, with full right and authority to appoint two members of the board of trustees for the government of said asylum, to prescribe the conditions upon which the money should be provided, drawn, and expended in the repair and maintaining of the same, and to contract for and make all repairs and improvements upon said property.

The complaint then alleges that in September, 1882, the erection of flights of iron staircase in said buildings was necessary, in order to provide for the safety of the inmates in the event of the burning of the buildings; that the county board caused plans and specifications of such staircase to be prepared, and submitted them to the acting trustees and acting superintendent of said asylum for approval, by whom they were approved; and that on September 19, 1882, the county board entered into a contract with Greenslade Bros. for the construction of such staircase. It further alleges that the defendants, acting as the trustees and the superintendent of said asylum, have prevented and do prevent the execution of such contract and the erection of the staircase by the contractor, and themselves assume the right to make all repairs and improvements upon said buildings, and threaten and intend to make various and extensive repairs and permanent improvements thereon, without the advice, consent, or action of the county board; and that the defendants have employed, without the consent of the county board, mechanics and workmen for the purpose of making repairs and pretended improvements, and have charged the pay and expenses of said men to the plaintiff, and insist upon their right so to do.

The complaint prays that the defendants be enjoined from interfering with the erection of the staircase by the con-

tractor, or with the making of any other repairs or improvements by the plaintiff, and that they be further enjoined from making any repairs or pretended improvements on the buildings of the asylum at the expense of the plaintiff.

A general demurrer to the complaint was sustained, and from the order entered in that behalf the plaintiff appealed.

*John M. Clarke*, attorney, and *J. C. McKenney*, of counsel, for the appellant, contended that the site and buildings of the asylum, upon which the county had expended over $200,000, became its private property, and no subsequent act of legislation could deprive it of its vested rights therein. 1 Dillon on Mun. Corp., secs. 30, 39, 40, 43; *Clinton v. C. R. & M. R. R. R. Co.*, 2 Withrow Corp. Cas., 268; *Sholes v. State*, 2 Pin., 499; *M., W. & M. P. R. Co. v. Reynolds*, 3 Wis., 287; *Town of Milwaukee v. City of Milwaukee*, 12 id., 93; *Louisville v. President, etc.*, 15 B. Mon., 642; 2 Kent's Comm., 275, 305–6; *Atkins v. Town of Randolph*, 31 Vt., 226. Under ch. 298, Laws of 1878, the county had entire control and management of the asylum property. Sec. 8, ch. 233, Laws of 1881, which compels the board of supervisors to make appropriations quarterly in advance for the maintenance of the asylum and for the improvement of the grounds and buildings, according to the estimates of the trustees, and to pay said appropriations on the order of the trustees, and ch. 283, Laws of 1882, which deprives the county of all voice in the appointment of trustees, are void. *Dartmouth College v. Woodward*, 4 Wheat., 694; *People v. Morris*, 13 Wend., 325; *Purdy v. People*, 4 Hill, 384; *People v. Kerr*, 27 N. Y., 188; *State ex rel. Keenan v. Supervisors*, 25 Wis., 339.

*L. F. Frisby*, for the respondents, argued, among other things, that ch. 233, Laws of 1881, and ch. 283, Laws of 1882, admitting them to have the effect contended for by the appellant, simply changed the form of government of

the asylum, and are valid enactments.  1 Dillon on Mun. Corp. (3d ed.), secs. 53, 54, 60, 61, 63, 72–74; Cooley's Con. Lim. (5th ed.), 230, 231, 251, 289, 290, 539; 1 Potter on Corp., secs. 370, 372, 396, 397; *People v. Mahaney*, 13 Mich., 500; *U. S. v. Railroad Co.*, 17 Wall., 328–9; *People v. Morris*, 13 Wend., 331; *Mount Pleasant v. Beckwith*, 100 U. S., 524; *East Hartford v. Hartford Bridge Co.*, 10 How., 533–4; *People ex rel. Springfield v. Power*, 25 Ill., 187; *Bush v. Shipman*, 5 Ill., 187; *Supervisors of Sangamon Co. v. Springfield*, 63 Ill., 66; *Town of Guilford v. Supervisors*, 13 N. Y., 148–9; *Meriwether v. Garrett*, 102 U. S., 472; *Trustees of Schools v. Tatman*, 13 Ill., 27; *Rawson v. Spencer*, 113 Mass., 40; *Montpelier v. East Montpelier*, 29 Vt., 12; *Scituate v. Weymouth*, 108 Mass., 128; *Chapin v. Crusen*, 31 Wis., 214.

COLE, C. J.  On the argument of this case we were strongly urged to decide some questions which do not properly arise upon the record; that is to say, whether the legislature had the power to take from the county board the right to appoint two of the trustees of the county insane asylum, or whether the legislature could place the financial management of the property under the control of the trustees.  The first question is not in the case, but the second one is involved to some extent, therefore will be considered.  But we deem it proper to say at the outset that our decision will be limited to the case before us.  And that case in brief is this:  Was the county board, upon the facts stated, entitled to an injunction restraining the trustees from interfering in any way with the work of making repairs or improvements on the building of the county insane asylum?  The complaint alleges that the county board had entered into a contract with Greenslade Bros. to erect and complete the iron work on four flights of staircase for the building, but that the trustees will not allow the work to be done.  Hence, an

injunction is asked to restrain the trustees from interfering with the work, and this is the only relief demanded. And the question to be decided is, Can the county board have that relief upon the facts stated? In order to decide that question it is necessary to examine the statutes upon the subject and ascertain whether it was the duty of the county board to make the repairs and improvements.

At an early period in its history the state undertook to provide a hospital for the insane, and established one near Madison. Subsequently the insane hospital located near the city of Oshkosh was founded. These were state institutions, chiefly maintained at the expense of the state, and wholly under the control and supervision of the state. More recently when the number of insane persons of the state exceeded the number of such persons who could be conveniently and properly cared for in the state institutions already existing by law, provision was made for the establishment of county insane asylums. See ch. 298, Laws of 1878. By that statute counties were authorized, upon certain conditions named, to purchase sites and erect buildings thereon for the care of insane and inebriate persons; and it appears from the complaint that Milwaukee county had, in October, 1880, paid out and expended for a site for an asylum and buildings thereon, for furnishing such buildings, for farm property, the improvement of the grounds, and for the care and treatment of persons in the asylums, the sum of $200,000. Under the act of 1878 the governor appointed three trustees, and the board of supervisors two trustees, all of whom were required to be resident citizens of the county in which the asylum was located. Afterwards the law was changed, and the power of appointing trustees, either for a vacancy or for a full term, was conferred upon the governor. (See sec. 7, ch. 233, Laws of 1881, and ch. 283, Laws of 1882). By the original act the treasurer of the county was made the treasurer of the asylum.

The policy of all the legislation in regard to county asylums plainly is for the state to retain more or less control and supervision over them. The state pays a certain proportion of the cost of the buildings in consideration of the amounts previously paid by the county in the construction of the state institutions. The state also contributes annually to the expense of supporting the insane inmates in the county asylums upon a basis of eighty per cent. of what it would cost the state per week *per capita* to maintain such inmates in the state institutions. All laws relating to the government and management of state institutions, and the powers of trustees therefor, are declared to be in force and effect as to county asylums so far as the same are applicable. But except as otherwise provided in the act the entire cost of constructing and maintaining the county asylum is cast upon the county in which the asylum is located. The law, however, does not attempt to define — except by way of reference to the duties and powers of boards of trustees of state institutions — the duties and powers of the board of trustees of county asylums. As the general statutes clearly point out and define the powers and duties of the state boards, to these laws the local boards of trustees must resort to ascertain the nature and extent of their powers and duties. But it is the manifest intention of the law that the local boards should have the entire management of, and exercise the same government and control over, the county asylums that the state boards did over the state institutions. They are to report to the board of supervisors as often as such board may require; also annually to the governor the conditions and wants of the asylum of which they have charge; and make to the state board of charities and reform a full and detailed statement of all receipts and expenditures on account of the asylum, and all other facts concerning the management and administration of the same. Sec. 4, ch. 298, Laws of 1878.

The act of 1881 makes some further provision for the care of the chronic insane not otherwise provided for; but it does not essentially change the powers and duties of the county board of trustees in respect to the matter under consideration. The eighth section of that chapter reads as follows: "It shall be the duty of the board of supervisors of any county in this state in which any county asylum has been established for the care of the insane, to make sufficient appropriations quarterly in advance for the support and maintenance of said asylum, in accordance with the estimates of the board of trustees of said asylum, for an amount in the aggregate equal to the amount *per capita* provided by law to be paid to said county by the state for the support and maintenance of such asylum, with such additional amount as may be necessary for improvement of the grounds and buildings, or such lesser sum as shall be equal to the estimates of said trustees for the purposes named; and such appropriations so made shall be paid for said purpose on the order of said board of trustees, in such manner as said board may provide in its by-laws."

Now, under this section, the county board of supervisors has the right and power to determine the amount of money which it is necessary to raise and appropriate for the improvement of the grounds and buildings of the asylum. When the county board has determined the amount which it is deemed necessary for these purposes, they then are to proceed and raise the same by taxation; or the board may raise such lesser sum as shall be equal to the estimates of the trustees for these objects. The law provides that the money thus appropriated is to be paid over on the order of the board of trustees in such manner as said last-named board may provide in its by-laws; but the board of trustees have the right to expend this money for such improvements as they shall deem proper, and which will in their judgment best promote the welfare of the inmates. Presumably, the board of trustees will best know the real condition and

wants of the institution under their control; and the law goes upon the assumption that the trustees will make a more judicious expenditure of the money than the board of supervisors could do. But the law does not make it obligatory upon the county board of supervisors to raise and appropriate for improvements any sum which the trustees may ask for. The county board has a discretion in the matter, and may make such an appropriation as it may deem necessary. In respect to the amount which the board of supervisors is required to appropriate quarterly in advance for the support and maintenance of the asylum, the law may be mandatory, though that question is not before us, therefore is not decided. But as to the sum which shall be expended for improvements, the county board of supervisors may exercise their discretion both as to the necessity and amount. When the money is raised and appropriated, it is then to be disbursed by the board of trustees for the purpose for which it was raised, or for such improvements as the trustees think best to make. Before the organization of the state board of supervision under ch. 298, Laws of 1881, it cannot be doubted, had the legislature appropriated money for the repair or improvement of one of the state hospitals for the insane, but that it would have been the duty of the board of trustees of such institution to receive and expend the appropriation for the purpose designated. So the board of trustees of the county asylum has the right to disburse money which has been raised and appropriated by the board of supervisors for repairs and improvements. As we have said, the local board of trustees may exercise their judgment and discretion as to the nature and character of the improvements. It therefore follows from the views expressed that the county board of supervisors had no right to do the work which they contracted to have done. The duty of making these repairs and improvements was imposed by law upon the board of trustees.

In opposition to this view of the law, the learned counsel

for the board of supervisors argue and insist that, as the county purchased the site and erected the asylum buildings thereon, the institution became county property to all intents and purposes. They say the board of supervisors is the body whose duty it is to look after the property of the county; to keep in repair the county buildings; to insure them for the benefit of the county. Consequently they claim the county board had the right to make the repairs in question on the asylum property. But the conclusive answer to this argument is that the county acquired the site and constructed the buildings upon the conditions prescribed in the act of 1878. The authority of the county to acquire the property for an insane and inebriate asylum is derived wholly from that act. By that law the county was authorized to purchase a site for a county asylum, which should contain not less than forty acres, and should be approved by the governor. But the county could not acquire a site or erect buildings for such a purpose until the governor and state board of charities should make and file with the secretary of state a certificate that a necessity existed for such additional asylum for the insane. Then, before proceeding to the construction of buildings, the county board had to submit to the governor and state board of charities the complete plans of the proposed buildings, for the approval of the governor and the said board. When the buildings were completed, the governor and state board of charities accepted them. Every provision of the law clearly shows that the state retains a control and supervision over the asylum. Its government, management, and administration are entrusted to a board of trustees. The county board of supervisors assented to that arrangement at the outset. The board consented that, so far as this property was concerned, considering the humane and benevolent purpose to which it was devoted, it should stand upon a footing different from other county property. Should the use of the property for an insane

and inebriate asylum be abandoned, it well may be that the exclusive possession and control thereof would become vested in the county which owns the property. But while it is used for an insane asylum, the county board has no reason to complain so long as it is carried on and managed in substantial compliance with the conditions upon which it was acquired.

The learned counsel argued the case upon the assumption that the legislature had attempted to appropriate this property to its own use, or to some purpose other than that for which it was originally intended. There is no fact in the case which justifies any such assumption. There is not a fact in the case which shows that the legislature has undertaken in any way to pervert the use of the property, or to divest the proprietary rights of the county therein. As we have said, we do not think the law of 1881 enlarged or changed the powers of the trustees, so far as making repairs and improvements were concerned. For, while the law of 1878 contains no specific provision about improvements or repairs, yet the clear implication is, when such work was to be done and money was provided for the purpose, that the board of trustees were to make them. How far the legislature may go in changing the control and management of county insane asylums, in abolishing boards of trustees having charge of them, and in conferring their powers and duties upon some other body, is a question we may leave for future adjudication. It is certainly not in this case.

The demurrer to the complaint was properly sustained, and the order of the county court must therefore be affirmed.

*By the Court.*—Order affirmed.